**ALMA ACKERMAN, Plaintiff**

**v.**

**HEIRS AND NEXT OF KIN OF
CARIDAD LA FONTAINE, Deceased, et al.,
Defendants**

Civil No. 95-1954

District Court of the Virgin Islands

Div. of St. Thomas and St. John
at Charlotte Amalie

December 23, 1954

ALPHONSO CHRISTIAN, *for plaintiff*
JORGE RODRIGUEZ, *for defendant*

MOORE, *Judge*

This matter came on for hearing with plaintiff Alma Ackerman represented by Attorney Alphonso Christian and the defendant estate by Attorney Jorge Rodriguez. Mrs. Alma Gimenez, Administratrix of the Estate of Caridad LaFontaine, appeared for the estate.

This is an action to quiet title brought by plaintiff who claims to be the rightful owner of property No. 9B Prindsens Gade, Kings Quarter, St. Thomas, by reason of an oral gift to her by the owner of record, Caridad La Fontaine, deceased, and by reason of adverse possession against the said Caridad La Fontaine. Defendant estate denies that any gift was ever made to plaintiff by Caridad La Fontaine and that even if such a gift had been made it would be void under the Statute of Frauds; and secondly, that a donee cannot hold adversely against the owner, and, also, that plaintiff never did hold the property out as her own until the filing of this suit. Defendants contend that plaintiff was put in charge of the property by Caridad La Fontaine and was at all times merely her agent for the management of the property and collection of rents. Plaintiff, on the other hand, insists that she, at all times, held the property out as hers and never had any relationship of agency with Caridad La Fontaine.

Since the evidence in the case is contradictory, a summary of the testimony presented and adduced by each side will be given.

*Plaintiff's Case*

Plaintiff was known by persons in the community (two of whom testified on her behalf) to be a very close friend of Caridad La Fontaine. In 1928 they made a trip together to New York; plaintiff leaving for a short trip

90

while Caridad was going for an indefinite period, having given up her job as chief nurse of the municipal hospital. Plaintiff testified that she contributed $100.00 to enable Caridad and her adopted daughter, Mildred, to make the trip, and that while in New York plaintiff also contributed to her board for three months as Caridad was short of money.

While they were in New York, a baby was born to Eugenie Cruse, plaintiff's daughter who had also made the trip from St. Thomas. The baby was baptized in New York in December, 1928, and Caridad La Fontaine was one of its godparents. Plaintiff left New York on December 29, 1928, with this grandchild, leaving the mother of the child in New York. Plaintiff testified that the night before her departure Caridad handed her the keys to the property No. 9B Prindsens Gade and said to her, in her presence alone: "Alma, I do not know how to repay you for all your kindnesses to me both in St. Thomas and New York. Take the old shack in St. Thomas, do with it as you please and support my godchild. If Justin Faulkner (stepfather of Caridad La Fontaine) should die before you, contribute $25.00 so that he may receive a decent burial."

Plaintiff testified that from that moment on she considered the property to be hers, held it out as her own, and never reported or accounted to anyone for it. She made repairs to the property without the consent or approval of anyone and paid the tax bills from her own personal money, although she did pay these bills in the name of Caridad La Fontaine, who remained the owner of record. The property having been badly damaged by the 1928 hurricane, plaintiff had it repaired in 1936, spending approximately $563.00. Since 1936 the property has been continuously rented, yielding approximately $6.25 a month.

Plaintiff's daughter, Eugenie Cruse, testified that she has always understood from her mother that the property was given to her by Caridad La Fontaine and that her mother always acted as though the property was her own.

Morris Nibbs, a tenant of the property from 1936 to the present, testified on plaintiff's behalf that he was always under the impression that the property belonged to Mrs. Ackerman, the plaintiff, although he has heard Justin Faulkner, an old man who lives in the yard, grumbling that "somebody has taken his property away."

*Defendant's Case*

Justin Faulkner, a very old man and Caridad La Fontaine's stepfather, testified that he gave the property to Caridad by deed of gift and that when Caridad was leaving she left the property with Mrs. Ackerman for her "to pick up the rents" and give him a part of the said rents, but this she never did, leaving him a part of the property to live in.

Elna Thon, sister of the deceased Caridad la Fontaine, testified that her sister and Mrs. Ackerman were very close friends and that when her sister was leaving for the States she told her that Mrs. Ackerman would be "in charge of the place," meaning No. 9B Prindsens Gade. Miss Thon also testified that she corresponded with her sister from 1930 to 1944 and that her sister often made mention of her property and of instructions she had given Mrs. Ackerman respecting the property. She said her sister particularly complained that Mrs. Ackerman did not write to her or send her any accounting.

Five letters from Caridad La Fontaine were introduced in evidence and the pertinent parts therefrom are here quoted:

Letter of April 4th to Elna Thon (deft.'s exhibit A):

92

"I wrote to Mrs. Ackerman years ago and told her to let you and Edwin have a room in the front house. My mother would have wanted it for Edwin and I do too. I want him to grow up in a nice home. In fact I wanted him to have the whole home. Of course, I wanted him to have some money too. That is why — when Mrs. Ackerman wrote and asked if she should send any of the rent — I told her — No. Put it in the bank and give Edwin all that he needs."

## Letter of March 1, 1944, to Elna Thon (deft.'s exhibit B):

"And I am not going to let him (Justin) or Mrs. Ackerman take that house. I want it to remain in the family so that you, Edwin and our brother can always have a home to come back to. I am doing it for my mother's sake as she would want it that way . . . By the way, if Justin makes any trouble for me I'll make him pay me every penny I've spent on that house and on him and he would have to sell the house if he can get it to pay me for my mother's hospital bill, her funeral grave and even the shoes he wore to the funeral and the taxes I paid even when my mother was alive."

## Letter of January 27, 1944, to Elna Thon (deft.'s exhibit C):

"As soon as Mrs. Ackerman went back home she sent to me for the taxes, $10.00. I sent it. The next time taxes were due she sent to me again for the money. I was making very little therefore, I had to put everything in pawn — or as they say here, in Hock. Those things I lost as I never was able to redeem them. You know the nice bracelets and rings earrings and my mandoline that cost so much also some Rodgers silverware all went to the Pawn Shop for that property.

"Then another time I got a letter saying the Sheriff was going to sell the house for taxes. The amount was supposed to be Thirty dollars ($30.00). I had to borrow the money from the place where I worked. After sending it — I got a letter saying it was $50.00 not $30.00 so I had to get another additional $20.00 in order that the place should not be sold, because I wanted you and Edwin to have a home . . ."

"A few years ago I wrote to Mrs. Ackerman telling her to let you and Edwin have the bedroom in the house because I wanted

93

you to be comfortable. I thought she did as I said. Anyway I am going to write to her and Justin and believe me I am not the fool I was to let people push me around . . . Tell me Elna, how much does she ask for the whole house? I mean a month and is it rented now?"

Letter of November 16, 1943, to Edwin Bradshaw (deft.'s exhibit D):

"You know the last time Mrs. Ackerman wrote to me she wanted to know if she should send me any money from the house. Of course, I know it is not bringing in much — so I told her whatever was over after expenses to put in the bank and to give you for expenses.

"I have not heard from her in years and therefore, do not know just what has been taking place.

"Don't let her know I have written or that I have sent you any money."

Letter of January 31, 1944, to Justin (deft.'s exhibit E):

"Tell me how are you making out? What about the house, do you get anything from Mrs. Ackerman? I haven't heard from her since 1931 or 32. I am going to try and write to her within the next day or two. She probably thinks I am dead."

Mrs. Alma Gimenez, administratrix of the estate, testified that Caridad La Fontaine was married to her brother and that their adopted daughter, Mildred, wrote to her early in this year informing her of the death of her mother, Caridad, in New York, in September 1947 (the death certificate is filed in Probate No. 8 - 1954) and asking her to find out from Mrs. Ackerman about the rents from her mother's property. She did go to see Mrs. Ackerman and took with her one Miss Teresita Moolenaar. Mrs. Gimenez testified that Mrs. Ackerman said to her in the presence of Miss Moolenaar that "I do not believe that Caridad is dead. If she is let Mildred send me her death certificate and I will deliver over the house and money to her, but Mildred could never manage the property herself." Mrs. Gimenez further testified

that Mrs. Ackerman never once mentioned or indicated that she considered the property hers although she appeared quite annoyed that they had come to inquire about it, and brought out a book in which she said she kept an accounting but never showed them the contents thereof. When Mrs. Gimenez asked to see the property Mrs. Ackerman told them they were free to go down and look at it from the street but that there were bad dogs in the yard so they had better not enter.

Miss Moolenaar corroborated this testimony by Mrs. Gimenez, adding that Mrs. Ackerman also said that "if it comes to the push, she had Mildred's money put aside."

Pursuant to power of attorney from Mildred La Fontaine dated April 3, 1954, Mrs. Gimenez petitioned this court (Probate No. 8 - 1954) to appoint her the administratrix of the estate of Caridad La Fontaine and to order Mrs. Ackerman to make an accounting of the rents from the date of Caridad's death, September 27, 1947, to the present and to turn over the property to the administratrix. Order to show cause was issued to Mrs. Ackerman to appear before the District Court on May 15, 1954. Mrs. Ackerman did not appear. However, on May 26 she moved the Court for a continuance of the probate proceeding until this action instituted by her is determined.

The following questions of fact and law are raised by the evidence:

*Of fact* — (1) Did Caridad La Fontaine, owner of record of property No. 9B Prindsens Gade, make an oral gift of that property to Alma Ackerman, plaintiff in this case?

(2) If such an oral gift were not made, did the conduct of plaintiff amount to a holding of the property under color and claim of title?

*Of Law* — (1) Is an oral gift of real property valid?

(2) Can the donee of real property hold adversely against the donor of said property? Or, can an agent hold adversely against the owner?

There is a heavy preponderance of evidence in this case negativing the claim of a gift of the property to plaintiff by Caridad La Fontaine.

There is to begin with no evidence to support plaintiff's testimony that when Caridad La Fontaine, deceased, left here she was in need and that plaintiff had to contribute to her support. It has been testified to that the deceased was head nurse at the municipal hospital up to the time of her departure from the island and also had many private cases as a midwife. Further, if deceased were in such poor circumstances, it is not likely that she would have taken her adopted daughter with her to an unknown place with no means of support. That plaintiff and deceased were very close friends has not been denied by anyone, but to the contrary, deceased's sister Elna Thon testified that they were closer than members of a family. But even close friendship is not sufficient to establish a presumption that deceased intended to make an outright gift of property to plaintiff when she gave plaintiff the keys to property No. 9B Prindsens Gade. Defendant's contention that plaintiff was merely left in charge of the property is far more logical and the letters from deceased establish that that was the understanding deceased had with plaintiff. While the plaintiff may have had greater privileges and powers than many agents on account of friendship, she was, nevertheless, no more than the agent of deceased to rent and manage the property, at least in so far as deceased understood.

The letters of deceased to her sister and nephew give positive proof that deceased never considered she had relinquished title to or any interest in property No. 9B Prindsens Gade either to her friend Mrs. Ackerman or to her stepfather, Justin Faulkner. Deceased repeatedly stated in these letters that she had "told" or "instructed" Mrs. Ackerman to do various things with the

property or the rent therefrom. She could only purport to give such instructions to plaintiff if she were her agent. The Court does not share the opinion of plaintiff's attorney that the letters were written in these terms merely as "solace" to deceased's relatives. Deceased's letters, all of them, show a genuine concern and affection on the part of deceased for her family and we do not believe that they were written with any intention to camouflage or distort the true situation. If deceased were not truly concerned about the welfare of her sister and nephew there would have been no necessity for her to write such solicitous letters which do not even suggest any irritation at requests for help from her sister.

It, therefore, appears to the Court, from deceased's letters as well as from the testimony of her sister, that the deceased had left the property with plaintiff for her to rent and manage it. It, also, appears from these letters that plaintiff understood that that was the arrangement for deceased writes that "Mrs. Ackerman wrote and asked if she should send any of the rent." Deceased seems to have had implicit trust in plaintiff and even though she did not hear from her, she seemed to have believed and expected that plaintiff was carrying out her instructions and wishes with regard to banking some of the money and giving a portion to her nephew. Counsel for plaintiff makes much of the fact that deceased never received any accounting from the plaintiff and never did anything about it. That deceased never went further than making requests by letter for an accounting is explained by the very close friendship which existed between deceased and plaintiff and which was testified to by plaintiff's witnesses. Deceased's own sister was reluctant to interfere because of the close relationship between deceased and plaintiff.

However, even supposing that plaintiff's testimony

that Caridad La Fontaine gave her the property in grate-fulness for plaintiff's kindnesses to her were true, such an oral gift of real property is void under the Statute of Frauds which requires that any interest in land other than lease for a term not exceeding one year shall be created only by deed of conveyance in writing and sub-scribed to by the party creating or granting same. Code of the Municipality of St. Thomas and St. John (1921), Title II, ch. 9, sec. 1 (28 V.I.C. §§ 241, 242).

Much emphasis has also been placed by counsel on the fact that plaintiff paid the taxes. It appears, from de-ceased's letters, that, before the property was fixed up and yielding an income, plaintiff used to send to deceased for money to pay the taxes (see defendant's exhibit C where deceased describes the sacrifices she made to se-cure money for the taxes). Thereafter, the taxes must have been paid out of the rent collected. The fact that Mrs. Ackerman paid these taxes does not even tend to estab-lish that she held the property out as her own since the taxes were paid in the name of Caridad La Fontaine and out of monies collected from rentals for the property.

■ There is some evidence that tenants and workmen on the property were led to believe by plaintiff's manner that the property was her own, but this evidence is far from conclusive of any "holding out" by plaintiff for as manager of the properties such an impression could easily have been created without any actual "holding out" by the plaintiff in adverse possession.

Contradicting plaintiff's claim that she held the prop-erty under color and claim of title is the testimony of Mrs. Gimenez and Miss Moolenaar who both said that when they went to see plaintiff early this year, before this suit was brought, she never even intimated that she considered the property hers. They admit that she seemed reluctant to relinquish it or give any accounting, but at

no time did she say to them "this is my property and you or Mildred have nothing to do with it." Or even that "I owe no one an accounting." On the contrary, she admitted that she had Mildred's money for her if she proved that her mother was dead.

It is the opinion of the Court that not only was no oral gift of the property made to plaintiff and that, if made, it was void, but, also, that plaintiff has not held the property under either color or claim of title and, therefore, the doctrine of adverse possession does not come into force. It is the opinion of the Court that plaintiff was in fact the agent of deceased and was acting as such agent at the time of her death. Since in the Court's opinion plaintiff did not hold the property adversely, there is no need to go into the question of whether plaintiff as an alleged donee of the property could under the circumstances hold adversely against the owner-donor.

Plaintiff's complaint will, therefore, be dismissed and plaintiff will be ordered to turn over property No. 9B Prindsens Gade to the administratrix of the estate of Caridad La Fontaine, deceased, together with all cash on hand, and to render an accounting of rents received from September 27, 1947, date of Caridad La Fontaine's death, to the present.

Order may be drawn in accordance with this opinion.